**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| PAM K. WHEELER, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07CV3284 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

Pam K. Wheeler (Wheeler) filed an application for disability benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401 *et seq.*, and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, on August 21, 2003.[1]   The Social Security Administration (SSA) denied benefits initially and on reconsideration.  On June 7, 2005, an administrative law judge (ALJ) held a hearing and, on September 19, 2006, determined Wheeler was not disabled within the meaning of the Act from April 1, 2003, through the date of the decision.  The Appeals Council denied Wheeler's request for review on November 8, 2007.  Wheeler now seeks judicial review of the ALJ's determination as it represents the final decision of the Commissioner of the Social Security Administration.[2]

Wheeler filed a brief (Filing No. 13) and a reply brief (Filing No. 19) in support of this administrative appeal.  The Commissioner filed the transcript of the administrative record (TR.) (Filing No. 11 (not available electronically)), and a brief (Filing No. 16) in opposition of Wheeler's appeal for benefits.  Wheeler appeals the ALJ's decision and asks that the case be remanded for an award of benefits for five reasons:  (1) the ALJ failed to accept

---

[1]As a convenience, this document contains certain cross-document hyperlinks to documents previously filed in this case.  This document also contains links to the Nebraska local rules and legal citation from the federal reporters and Social Security Administration (SSA) materials.  The hyperlinked documents appear in blue underlined text.  Except with regard to the local rules and SSA materials, access to the hyperlinked material is subject to fees pursuant to user agreements.  The hyperlinks may be accessed without PACER fees by use of the public computer terminal in the Clerk's office.

[2]   The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  **See** Filing No. 12.

as controlling the limitations placed by the claimant's treating physician, Dr. Tamara Johnson; (2) the ALJ failed to give Dr. Johnson's opinions the greatest weight under the circumstances; (3) the ALJ failed to follow or properly discredit the opinions of Dr. Lee Kimzey, the consultative examiner (CE); (4) the ALJ improperly applied the **Polaski** factors when evaluating the claimant's credibility regarding subjective allegations of her physical condition; and (5) the ALJ relied on improper conclusions of the vocational expert (VE) based on misstatements of either the exertion or skill level required to perform the occupations.  **See** Filing No. 13 - Brief p. 11-12.  This court has jurisdiction to review the final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).  The court has reviewed the record, the ALJ's decision, the parties' briefs, the transcript, and applicable law, and finds the ALJ's ruling that Wheeler is not disabled should be affirmed because it is supported by substantial evidence in the record.

## PROCEDURAL BACKGROUND

Wheeler applied for disability benefits and SSI on August 21, 2003, pursuant to the Act (TR. 320-322; 533-535).  Wheeler alleged an inability to engage in any substantial and gainful work activity after February 3, 2000, due to major depressive disorder; bipolar disorder; compression fracture at L1 without radiculopathy; hypertension; and substance use disorder (alcohol), in remission (TR. 20).  The SSA denied benefits initially (TR. 274-275; 282-285; 536-540) and on reconsideration (TR. 276-277; 288-292; 541-546). Thereafter, on June 7, 2005, ALJ James Francis Gillet held a hearing (TR. 18; 561-634). At the hearing, Wheeler amended her alleged onset date to April 1, 2003 (TR. 601-02). ALJ Gillet issued a decision on September 19, 2006 (TR. 18-26).  The ALJ determined Wheeler was not disabled under sections 216(i) and 223(d) or section 1614(a)(3)(A) of the Act and was not eligible for disability benefits or SSI under the Act (TR. 25-26).  The Appeals Council denied Wheeler's request for review on November 8, 2007 (TR. 8-10).

## FACTUAL BACKGROUND

### A.    Medical and Personal History

Wheeler was born March 28, 1959 (TR. 320).  Wheeler completed four or more years of college, concluding in 1990, with a Baccalaureate Degree in Elementary Education (TR. 351, 629).  Wheeler's past relevant work consists of work as a sales associate, housekeeper/cleaner and teacher aide (TR. 24, 402).  Most recently, Wheeler has worked for a church cleaning two to three hours per week and as a cashier at a convenience store part-time, from September 2003 to May 2004 (TR. 348, 582).  Wheeler alleges she became unable to work on April 1, 2003, and has had no substantial and gainful work activity since then (TR. 20, 572).  Wheeler's allegations of disability are based on depression, mental problems and back pain (TR. 347).

From August 1996 to September 1998, Wheeler was treated by Samir Ishak, M.D., and Beverly A. Shively, M.S., at the Dodge City Area Mental Health Center for depression (TR. 221-250).  Between July 1999 and July 2001, Wheeler was treated at McCook Clinic for back pain and depression (TR. 147-155, 218-219).  On July 16, 1999, Wheeler sought treatment for depression at McCook Clinic (TR. 154).  She requested Prozac and stated she had been taking Prozac for approximately eight years (TR. 154).  In January 2000, Wheeler sought to continue Prozac and reported problems with weight gain and tiredness (TR. 152).  Wheeler also reported some back pain associated with lifting (TR. 152).  Wheeler was advised about diet and exercise (TR. 152).  In March 2000, Wheeler's medication was changed to Serzone due to her opinion the Prozac was no longer working (TR. 150-151).  However, Wheeler reported problems with confusion, frustration, sleeping problems and depression (TR. 150-151).  Wheeler was advised to discontinue Serzone and that situational depression, due to her financial and social situation, was not as responsive to antidepressant medication as endogenous depression (TR. 150).  Wheeler began taking Wellbutrin, then switched back to Prozac by July 2000 (TR. 149).

On September 22, 2000, Dr. Richard Klug, M.D., performed a state agency consultative exam (TR. 147-148).  Dr. Klug noted Wheeler reported problems with her back related to a 1995 L1 compression fracture (TR. 147-148).  Dr. Klug noted the examination

3

did not reveal any abnormalities, there was no tenderness, range of motion and strength were good (TR. 147-148).  Dr. Klug concluded Wheeler's back seems stable (TR. 148).

In September 2000, Wheeler also underwent a consultative psychological examination (TR. 158-63).  Rebecca Schroeder, Ph.D. assessed Wheeler with major depression, recurrent episode; and a GAF score of 60 (TR. 163).[3]  Dr. Schroeder noted Wheeler had a tendency to exaggerate her mental health condition, she presented information in a complaining manner, she seemed to see everything in her life as being worse that it possibly was, she seemed overly emotional and exaggerated the negative, and she had a histrionic edge to her comments (TR. 163).  Dr. Schroeder opined Wheeler did not seem to have trouble maintaining social functioning, she seemed able to maintain attention and concentration, understand and remember short and simple instructions, carry out instructions, relate appropriately to coworkers and supervisors, and adapt to changes within her environment (TR. 163).  Dr. Schroeder opined Wheeler's low energy level, during periods of significant depression, did seem to restrict Wheeler's daily living (TR. 162).

Wheeler sought mental health treatment at Heartland Counseling and Consulting Clinic on April 13, 2000.  Wheeler underwent counseling with Marsha Wilkison, L.M.H.P., from April 13, 2000, until April 20, 2005 (TR. 199-217, 251-57, 456, 458, 460-462, 487-90, 499, 501, 503, 505, 507-09, 511, 513, 554-60 ).  On April 13, 2000, Ms. Wilkison noted Wheeler had a global assessment of functioning (GAF) score of 54 (TR. 490).  On January 23, 2002, Ms. Wilkison opined that Wheeler's symptoms sometimes interfered with her ability to work and socialize; she had problems sustaining concentration and attention needed for task completion and adapting to changes in her environment; however, Wheeler could understand, remember, and carry out short and simple instructions and

---

[3]Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 30-32 (4th ed. 1994)(DSM-IV).  A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). **See** *id.* at 34 (4th ed. Text Revision 2000) (DSM-IV-TR).

relate to coworkers (TR. 251-257). In April 2002, Wheeler began substance abuse counseling with Kim Spargo (TR. 483-86).

On March 31, 2003, Tamara R. Johnson, M.D., examined Wheeler for poorly controlled depression (TR. 480-482). Wheeler reported her medications were not effective (TR. 480). Wheeler's symptoms were poor motivation, emotional lability, low energy and problems with distraction (TR. 480). Wheeler was fidgety and became tearful during her examination, and she exhibited some tangential thinking and flight of ideas (TR. 481). However, Wheeler presented on time, well groomed, was conversant, cooperative and made good eye contact (TR. 480-481). Dr. Johnson opined Wheeler demonstrated fairly good recall, but had poor judgment and limited insight based on her social situation and legal trouble (TR. 481). Dr. Johnson suspected Wheeler might have bipolar disorder and prescribed Zyprexa (TR. 481-482).

At her next visit on April 10, 2003, Wheeler showed some compulsive and impulsive thinking, but her mental status was "pretty normal" as compared to her first visit (TR. 478). Wheeler reported excessive sleep and remained "distractable," but was not as tearful as before (TR. 478). Dr. Johnson discontinued Prozac and Zyprexa, but prescribed Lexipro (TR. 478-479). Two weeks later, due to headaches, Dr. Johnson discontinued Lexipro and prescribed Effexor XR (TR. 477). Dr. Johnson noted her concern that Wheeler may be suffering "plain depression" or have a bipolar disorder, in which case the medication would not be effective (TR. 477).

On May 12, 2003, Wheeler's depression was stable, but she was having difficulty sleeping (TR. 476). Dr. Johnson prescribed Seroquel, primarily for sleep (TR. 476). On May 19, 2003, Dr. Johnson notes Wheeler looks good, her affect is much the same as usual, and her mental status appears fairly good (TR. 475). Wheeler reported sleeping well, but having some headaches and no real benefit from the Effexor XR (TR. 475). Dr. Johnson increased the Effexor XR dosage (TR. 475). On May 29, 2003, Dr. Johnson discontinued the Effexor and increased the Seroquel in response to Wheeler's complaints of trouble sleeping and headaches (TR. 474). Dr. Johnson notes Wheeler went through a difficult time breaking up with her boyfriend (TR. 474). Over the next several months,

5

Wheeler's bipolar disorder was stable and Prozac was prescribed again in July of 2003 (TR. 464-473, 445).

On September 30, 2003, Leland F. Lamberty, M.D. examined Wheeler for chronic back pain (TR. 445-448).  Wheeler had some tenderness over her upper lumbar spine area with no gross deformity (TR. 447).  In her back and spine, Wheeler's range of motion was "really quite good" and she performed with some "mild" complaints of discomfort (TR. 447). Wheeler had "good" range of motion and "good" strength in her extremities (TR. 447).  She had no motor or sensory deficits (TR. 447).  X-ray examination of her lumbar spine showed close to a 50 percent compression fracture of L1 with some narrowing of the disk space of T12-L1 (TR. 447).  Wheeler's other disk spaces were well maintained and the remainder of her spine alignment was "excellent" (TR. 447).  Dr. Lamberty's impressions were that Wheeler suffered from an old compression fracture of L1 with chronic low back pain, bipolar disease, and a history of alcohol abuse (TR. 447).  He opined that Wheeler appeared motivated, but that her emotional problems created as many problems as her back pain (TR. 448).  Dr. Lamberty indicated Wheeler was not a candidate for prolonged standing, walking, lifting, or twisting and any significant amount of time spent in one position would probably be uncomfortable (TR. 448).  Dr. Lamberty concluded Wheeler was fully capable of using her arms without difficulty and walking as long as it was not prolonged (TR. 448).

On October 20, 2003, Wheeler reported back pain caused by additional hours at work (TR. 470).  Wheeler had also received her fourth denial of disability benefits (TR. 470).  Dr. Johnson noted Wheeler's bipolar disorder continued to be stable (TR. 470). However, Dr. Johnson wrote a note, for Wheeler to take to work, indicating Wheeler could only work up to twenty hours per week, up to five hours per day (TR. 470; 497).  The following month, Wheeler was cheerful, doing better and her work situation was less stressful (TR. 469).

In January 2004, Wheeler reported a few more depressive symptoms and increased back pain (TR. 467).  However there were no signs of hypomania or mania and Wheeler's thought processes appeared clear (TR. 467).  Dr. Johnson prescribed a higher dose of

Prozac and advised alternating between Ibuprofen and Tylenol to manage the back pain (TR. 467).  Wheeler continued to attend substance abuse counseling (TR. 468).

On February 26, 2004, Dr. Johnson noted Wheeler's medications were working as well as anything else she had tried (TR. 466).  Wheeler was dressed appropriately for work, maintained eye contract and was conversant (TR. 466).  Wheeler was "pretty stable" even though she was "kind of depressed" due to suffering the loss of her mother and a family pet earlier in February (TR. 466).  Wheeler's boyfriend had been incarcerated, which had lessened her pressure (TR. 466).

On the same date, Dr. Johnson filled out a form indicating Wheeler experienced pervasive loss of interest in almost all activities, appetite and sleep disturbances, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, and paranoid thinking (TR. 451; 466).  Dr. Johnson opined that Wheeler had "marked" restrictions of activities of daily living; "moderate" difficulties in maintaining social functioning; "frequent" deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and four or more episodes of deterioration or decompensation, each of extended duration (TR. 451).  Dr. Johnson indicated Wheeler had bipolar disorder characterized by frequent exacerbations involving depressive symptoms resulting in an inability to "sustain gainful employment" (TR. 451).

At her next appointment in March 2004, Wheeler was "doing well from a psychological standpoint" (TR. 465).  Prozac and Seroquel were working "very well" (TR. 465).  Wheeler's cognition and mental status looked "good" (TR. 465).  Dr. Johnson's impressions and recommendations were unchanged (TR. 465). In April 2004, Wheeler continued to be stable, and was doing well emotionally (TR. 464).

On June 7, 2004, Wheeler reported being very stressed due to the loss of her job due to absenteeism (TR. 463).  Wheeler was tearful, with a flattened affect and more anxious (TR. 463).  Dr. Johnson assessed bipolar disorder with worsened depression (TR. 463).  Wheeler also reported headaches due to the Prozac (TR. 463).  Dr. Johnson discontinued Prozac and prescribed Zoloft (TR. 463). Additionally, Wheeler was to resume counseling with Ms. Wilkison (TR. 463).  At a counseling appointment with Ms. Wilkison

two days later, Wheeler reported continued grief over the death of her mother and a dysfunctional relationship with her significant other (TR. 462). Wheeler continued to deal with grief and relationship issues at her next two appointments (TR. 460-61).

At an August 9, 2004 appointment with Dr. Johnson, Wheeler reported feeling "fairly blue" and she was a little tearful, but her thinking was clear and her speech was not pressured (TR. 459). Dr. Johnson prescribed Lamictal to try to stabilize Wheeler's mood (TR. 459). At a counseling appointment with Ms. Wilkison two weeks later, Wheeler was frustrated regarding her former employer's decision to appeal her unemployment benefits (TR. 458). Wheeler reported no relief from her medication change (TR. 458).

In August through October, 2004, Wheeler still did not see much improvement on Lamictal, which was terminated while the use of Zoloft increased (TR. 455, 457, 512). In August and September, Wheeler's affect was normal and her thinking was clear, she appeared "pretty good" and was a little cheerful, but was not stabilized (TR. 455, 457). Wheeler was happy after winning her unemployment benefits hearing, but continued to process her grief (TR. 456). Prior to the change in medication, Wheeler felt "very blue," was a little tearful and had a sad affect (TR. 512).

In November, Wheeler's headaches were better, and her mood no worse after stopping Lamictal (TR. 510). The Zoloft improved her mood and she looked better emotionally, seemed more spirited and lively, and was not at all tearful (TR. 510). At her next three counseling appointments with Ms. Wilkison, Wheeler indicated the holidays were a difficult time for her, and she was relieved and sad that her boyfriend had moved out of state (TR. 507-509).

Dr. Johnson prescribed Cymbalta, however Wheeler reported little change in her depression (TR. 506). Objectively, she was a little depressed and tearful, but her thinking was clear (TR. 506). At a counseling appointment three weeks later, Wheeler reported increased depression after being off of her medication for a week (TR. 505). The following day, Wheeler told Dr. Johnson that she had run out of Cymbalta, but indicated that it worked as well as her other medications (TR. 504). Wheeler was tearful, but Dr. Johnson noted that she had been off of her antidepressant for a week (TR. 504).

8

At her next counseling appointment, Wheeler indicated feeling "slightly better" after getting back on medication (TR. 503). Wheeler felt overwhelmed and anxious about the possibility of going back to court for a disability hearing (TR. 503). By February 28, 2005, Dr. Johnson noted Wheeler was "real stable on Cymbalta. Sleep is good, still just waiting to hear from disability, but no changes are needed today" (TR. 502). The following month, Wheeler continued to be stable with "pretty good" sleep and a "fairly stable" mood (TR. 500).

On April 16, 2005, Wheeler was admitted to Good Samaritan Hospital after she told friends she was tired of living and took more than the prescribed does of Seroquel (TR. 515-519). Wheeler was upset about her financial situation, being out of work and her inability to find out the status of her disability benefits for several months (TR. 517). Physical examination was normal, but Wheeler complained of back pain "on and off" especially when she lifted objects (TR. 518). On mental status examination, Wheeler had some suicidal ideas, but was alert and her thought processes were logical (TR. 518). Jose Gary G. Nadala, M.D., diagnosed bipolar disorder type II, currently depressed, and GAF score of 35/45 (TR. 518-519).[4] Wheeler was admitted for her safety and observation (TR. 519). Dr. Nadala prescribed Lamictal (TR. 519). Over the course of her admission, Wheeler became less depressed and attended individual and group treatment (TR. 515). Wheeler was discharged to her home on April 18, 2005 (TR. 515).

## B.   Administrative Hearing

At the administrative hearing on June 7, 2005, Wheeler testified she suffered from lower back pain that radiated down her legs (TR. 567). Although she did not see a physician regularly for her physical problems, she takes over-the-counter Ibuprofen for back pain (TR. 568, 583-584). Wheeler sees Dr. Johnson on a monthly basis for depression (TR. 568). Wheeler is on medication for bipolar disorder (TR. 574-575). She

---

[4]A GAF of 31 through 40 is characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). **See** DSM-IV-TR at 34.

said she takes her medications "pretty regularly," but occasionally needs to be reminded (TR. 587-588). On a typical day Wheeler sleeps from 10:30 p.m. until 11:00 a.m. or noon, spends a little time reading, and rests in bed (TR. 578-579). Wheeler states she has no energy or interest in anything (TR. 580-581). Wheeler prepares simple meals for herself, but her mobile home is unkempt (TR. 579-580). Wheeler leaves her home one to three times a week to shop or visit a friend (TR. 581). Wheeler becomes irritated with people when she goes out in public (TR. 582). Wheeler worked part-time in 2003 and 2004 as a cashier, but was fired for absenteeism, which was caused by back pain (TR. 582-583). Wheeler testified she has not drank alcohol since prior to April 1, 2003 (TR. 601-602).

Kathy Crosby, a friend of Wheeler, testified she "keeps tabs" on Wheeler and visits her three times per week (TR. 589-590, 592). She and Wheeler have known each other for 26 years (TR. 589). Ms. Crosby corroborated Wheeler's testimony as to impaired concentration, memory loss, failure to maintain her home, and aversion to social interaction (TR. 588-594).

Glen McClure, PhD. testified as a medical expert at the hearing. Dr. McClure reviewed Wheeler's medical history and listened to the testimony at the hearing. Dr. McClure concluded Wheeler does have a medically identified impairment – bipolar disorder (TR. 601). However, Dr. McClure gave his opinion that Wheeler's impairments do not meet or equal any impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, for a disability (TR. 601). Dr. McClure opined Wheeler had "moderate" restrictions of daily activities, "moderate" difficulties maintaining social functioning and concentration, persistence, and pace; and no prolonged episodes of decompensation (TR. 603). Dr. McClure opined Wheeler would be moderately limited in her ability to understand, remember and carry out detailed instructions; to make judgments on simple work related decisions; to interact with the general public, co-workers and supervisors; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a work setting (TR. 620-621). Dr. McClure noted Wheeler was cheerful at most of her therapy appointments and was tearful when she missed her medication (TR. 608). He also indicated that one explanation for Wheeler's increase in symptoms in 2003 was the fact that she stopped using alcohol (TR. 608-609). Further, Dr.

McClure noted Wheeler's treatment showed she made improvements, but underwent ups and downs with changes in her circumstances and medications (TR. 619, 621-623). Dr. McClure clarified it appeared she had not gotten any worse (TR. 623).

A vocational expert (VE), Gail Leonhardt, who is a Board Certified Vocational Expert, testified at the hearing and provided a report based on his review of the record and hearing testimony (TR. 301-302, 402, 623-625). The ALJ posed a hypothetical question to the VE that assumed an individual of Wheeler's age, education, and work experience with the residual functional capacity to perform the exertional demands of sedentary work (TR. 626). In addition, the individual had a "slight" limitation of the ability to carry out short and simple instructions, and "moderate" limitation of her ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public, coworkers, and supervisors; and respond appropriately to changes in the usual work setting (TR. 626). In addition, the individual could not use air or vibrating tools, drive a motor vehicle, work at unprotected heights, or work around temperature extremes (TR. 627). The questions also assumed an individual who required rest breaks that could be accommodated within normally scheduled breaks (TR. 627). The VE opined that such an individual would be incapable of performing Wheeler's past relevant work (TR. 625-627). However, such a person could perform other jobs such as telephone solicitor, sedentary cashier, and an unskilled to semi-skilled receptionist (TR. 629-30). If it were necessary for the individual to sit and stand at will, such jobs would not change significantly, except there were likely be no receptionist jobs available (TR. 631-632). However, if the individual had "marked" limitations on her ability to interact appropriately with the public, coworkers, and supervisors; and respond appropriately to changes in the usual work setting, then there would be no available jobs (TR. 630-631). Similarly, if the individual required breaks to lie down for thirty minutes in the morning and in the afternoon, there would be no available jobs (TR. 632).

Subsequent to the hearing date, the ALJ received additional evidence into the record including information from Dr. Johnson (TR. 521-525), and a consultative psychological evaluation performed by Lee Kimzey, M.D. (TR. 526-529). On June 20, 2005, Dr. Johnson wrote a letter indicating Wheeler's emotional instability made it

11

impossible for her to obtain and maintain gainful employment (TR. 521-523).  Dr. Johnson also filled out a Mental Residual Functional Capacity form on which she indicated Wheeler had "marked" limitations in 17 out of 20 functional criteria (TR. 524-525).

The following month, Wheeler underwent a consultative psychological evaluation with Dr. Kimzey (TR. 526-529).  Wheeler presented as a "pleasant and cooperative individual who had no difficulty with communication" (TR. 528).  Dr. Kimzey perceived her as a "mild and meek" person (TR. 528).  Wheeler was able to process information appropriately and there was no evidence of thought distortions (TR. 528).  Wheeler described ongoing significant levels of sadness and anxiety despite her ongoing treatment (TR. 528).  Wheeler denied any ongoing panic attacks (TR. 528).  Wheeler's insight and judgment were "fair" (TR. 528).  Dr. Kimzey diagnosed major depressive disorder, recurrent; generalized anxiety disorder; and a GAF score of 50 (TR. 529).

Dr. Kimzey also completed a Medical Source Statement form (TR. 530-532).  Dr. Kimzey indicated Wheeler had "marked" limitation of her ability to respond appropriately to work pressures in a usual work setting (TR. 531).  Dr. Kimzey indicated Wheeler had "moderate" limitation of her ability to make judgments on simple work-related decision, interact appropriately with supervisors and coworkers, and respond appropriately to changes in a routine work setting (TR. 530-531).  Wheeler had "slight" limitation of her ability to understand and remember detailed instructions, carry out detailed instructions, and interact appropriately with the public (TR. 530-531).  Finally, Wheeler had no limitation of her ability to understand, remember, and carry out short, simple instructions (TR. 530).

Subsequent to the ALJ's written opinion, on November 15, 2006, Dr. Johnson wrote a letter indicating she disagreed with the ALJ's decision and that Wheeler continued to experience frequent exacerbations of depression interspersed with hypomanic episodes (TR. 551).  Dr. Johnson indicated Wheeler's paranoia was so severe that she hardly ever left her home and only left for medical appointments or to go shopping once a month (TR. 551).  She indicated Wheeler's illness prohibited interaction with the public or being around people (TR. 551).  The Appeals Counsel received the letter and marked it as an exhibit in evidence (TR. 11).

12

## THE ALJ'S DECISION

The ALJ concluded Wheeler was not disabled under the Act from April 1, 2003, through the date of the decision (TR. 19). Accordingly, the ALJ determine Wheeler was not entitled to any disability benefits or SSI (TR. 26). The ALJ framed the issues as: 1) whether Wheeler was entitled to a period of disability and disability insurance benefits under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act; and 2) whether Wheeler met the insured status requirements of sections 216(i) and 223 of the Act (TR. 18). With respect to the second issue, the ALJ found Wheeler remained insured through March 31, 2008, and must establish disability on or before that date to be entitled to a period of disability and disability insurance benefits (TR. 18, 20). As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to any medically determinable physical or mental impairment or combination of impairments (TR. 18). **See** 42 U.S.C. § 423(d)(1)(A) (2004); 20 C.F.R. § 404.1505. These impairments must be expected to result in death or must last for a continuous period of at least 12 months. **Id.**

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations. ***Flynn v. Astrue***, 513 F.3d 788, 791 (8th Cir. 2008); 20 C.F.R. § 404.1520(a)(4).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quotation omitted). More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. **See** 20 C.F.R. § 404.1520(a); ***Braswell v. Heckler***, 733 F.2d 531, 533 (8th Cir. 1984). If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such

13

listed impairment, the claimant will be determined disabled without considering age, education, or work experience. **See** **_Braswell_**, 733 F.2d at 533. If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy. **See** **_Nevland v. Apfel_**, 204 F.3d 853, 857 (8th Cir. 2000). A claimant's residual functional capacity is a medical question. **See** **_id._** at 858.

**_Singh v. Apfel_**, 222 F.3d 448, 451 (8th Cir. 2000). "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled." **_Pelkey v. Barnhart_**, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted)).

In this case, the ALJ followed the appropriate sequential analysis. The ALJ reviewed the record and found Wheeler had not engaged in any type of substantial and gainful work activity since April 1, 2003 (TR. 20). Next, the ALJ found Wheeler had severe impairments including: major depressive disorder; bipolar disorder; compression fracture at L1 without radiculopy; hypertenion; and substance use disorder (alcohol), in remission (TR. 20). Further, the ALJ determined Wheeler's impairments were "severe" because they impose significant limitations on her ability to function and they interfere more than minimally with her ability to perform basic work-related activities (TR. 21).

At step three, the ALJ determined Wheeler did not have an impairment or combination of impairments that meets or medically equals one of the impairments described in the Listings of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926) (TR. 21). Specifically, the ALJ determined Wheeler's mental impairments caused moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration (TR. 21). The ALJ found that the "Part C" criteria were not met. The ALJ noted Wheeler's musculoskeletal impairments and symptoms were not associated with the inability to ambulate effectively (TR. 21).

14

The ALJ proceeded to step four to determine Wheeler's residual functional capacity (RFC) (TR. 21-24).  In assessing RFC, the ALJ, citing 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Rulings (SSR) 96-4p and 96-7p, discounted Wheeler's credibility as to the severity of her symptoms and her inability to function  (TR. 22).  The regulations and SSRs cited by the ALJ list factors to consider when determining credibility.  The ALJ found Wheeler's allegations were inconsistent with her use of only over-the-counter medications for back pain (TR. 23).  Further, the ALJ found Wheeler's activities of daily living and restrictions are out of proportion with the medical evidence of record (TR. 23).  The ALJ noted the VE identified thousands of jobs Wheeler could perform which incorporated Wheeler's functional limitations, such as sitting and limited contact with other people (TR. 23).  Wheeler appeared to adjust well to changes in medication when she underwent stressful periods of increased depression (TR. 23-24).  The ALJ noted Wheeler's work history makes an equivocal impact on her credibility (TR. 24).  The ALJ found "however, the remaining SSR 96-7p factors [as discussed herein] cast doubt on [Wheeler's] allegation of inability to perform any and all kinds of full-time, competitive, gainful employment on a sustained basis" (TR. 24).

In addition to finding Wheeler lacked credibility, the ALJ did not give great weight to Dr. Johnson's opinion that Wheeler meets section 12.04 of the Listing of Impairments (TR. 22; 451).  The ALJ relied more heavily on the testimony of Dr. McClure and the rationale of the State agency consultants at the initial and reconsideration levels (TR. 22).  Specifically, the ALJ found Dr. McClure's explanation of Dr. Johnson's work restriction to be plausible and not inconsistent with the other evidence in the record (TR. 22).  Dr. McClure indicated the restriction to twenty hours a week and five hours per day was imposed in response to a temporary exacerbation of symptoms (TR. 22).  Such symptoms could be temporary and resolve as treatment took effect (TR. 22).

The ALJ stated Dr. Johnson was an acceptable medical source and a treating source, but her opinion that Wheeler was disabled was not supported by her progress notes and is inconsistent with other medical evidence of record (TR. 24).  The ALJ determined the weight to assign Dr. Johnson's opinions in light of her inability to provide more detail to support her opinions about Wheeler's disabling limitations and despite her

15

explanation for the brevity of the progress notes (TR. 23). Specifically, Dr. Johnson's opinion conflicted with the opinions of Dr. Kimzey, Dr. McClure and the State agency consultants, who were essentially in agreement that Wheeler is capable of meeting the physical and mental demands of simple, unskilled, sedentary work (TR. 24).

The ALJ did give weight to the findings of the State agency consultants who noted Wheeler's history of depression, but that she had achieved significant stability with counseling and medication (TR. 22). The consultants also noted Wheeler presented well oriented and cheerful at her doctor appointments, which was different than how she was described by her friend (i.e., quick tempered and getting into fights) (TR. 23). However, Wheeler did appear to have poor relationships (TR. 23). Wheeler was able to work part-time although she reported some back pain (TR. 23). The consultants noted Wheeler's memory and intellect were within normal limits, and she takes her medication as prescribed (TR. 23). The consultants opined Wheeler could perform simple, unskilled work (TR. 23, 431). Further, the consultants opined Wheeler could perform light work with postural limitations due to her back pain (TR. 23). This was based on the evidence that Wheeler had no loss of sensation or motor control; was under no medical treatment for the condition; used only Tylenol for pain control; and is able to walk daily, drive and do some gardening (TR. 23, 438).

Similarly, the ALJ noted Dr. McClure's opinions were consistent with, although not identical to, the consultants' findings (TR. 23). In contrast, the ALJ noted Dr. Kimzey opined Wheeler had marked limitations in responding appropriately to work pressures in a usual work setting (TR. 23). The ALJ did not give great weight to this opinion because it was based on "interview data" suggesting Dr. Kimzey relied only on Wheeler's own reports to form the opinion (TR. 23). However, the ALJ discounted Wheeler's disability allegation, which was out of proportion with the record as a whole (TR. 23).

Wheeler did not see a physician for her physical pain and only saw Dr. Johnson periodically for medication checks and some counseling (TR. 22). Wheeler saw a mental health counselor periodically. Wheeler's therapist's, Ms. Wilkison, progress notes indicate Wheeler returned to therapy after "a considerable amount of time" due to the death of

Wheeler's mother and primarily to process grief (TR. 24, 452-491, 498-513).  Ms. Wilkison did not render an opinion about Wheeler's ability to work after April 1, 2003.

Based on the ALJ's evaluation of the evidence, the ALJ determined the evidence does not support Wheeler's allegation of inability to perform the physical and mental demands of substantial gainful activity (TR. 24).  The ALJ found Wheeler has the following RFC:

> to lift or carry 10 pounds or less; sit for 6 hours in an 8-hour workday; and stand or walk for 2 hours during an 8-hour workday.  The claimant is slightly limited in understanding, remembering, and carrying out short and simple instructions. She is moderately limited in understanding, remembering, and carrying out detailed instructions; using judgment to make simple work-related decisions; interacting with the public, supervisors, and co-workers; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a usual work setting.  She cannot use air or vibrating tools, use or work around motor vehicles, work at unprotected heights, or work in extremes of cold or humidity.  She requires periods of rest during the day, which can be accommodated during normal breaks.

The ALJ further determined, because of Wheeler's medically determinable impairments, Wheeler can no longer perform her past relevant work, but could perform sedentary unskilled occupations such as cashier and receptionist, which exist in her region in significant numbers (TR. 24-25).  Therefore, the ALJ found Wheeler is not under a disability as defined by the Act (TR. 25).

Wheeler appeals the ALJ's findings on five grounds:  (1) the ALJ failed to accept as controlling the limitations placed by Dr. Johnson, (2) the ALJ failed to give Dr. Johnson's opinions the greatest weight under the circumstances, (3) the ALJ failed to follow or properly discredit the opinions of Dr. Kimzey, (4) the ALJ improperly applied the *Polaski* factors when evaluating the claimant's credibility regarding subjective allegations of her physical condition, and (5) the ALJ relied on improper conclusions of the VE based on misstatements of either the exertion or skill level required to perform the occupations.  **See** Filing No. 13 - Brief p. 11-12.  The court will address each issue below.

**STANDARD OF REVIEW**

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g). A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). Questions of law are reviewed *de novo*. **See** *Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d 833. Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); **see also** *Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir. 1998) (noting "substantial evidence in the record as a whole" standard is more rigorous than the "substantial evidence" standard)).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Juszczyk*, 542 F.3d at 631; *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citation omitted). The reviewing court considers "the whole record, including evidence that supports as well as detracts from the Commissioner's decision, and [ ] will not reverse simply because some evidence may support the opposite conclusion." *Id.* at 578. "Whether the record supports a contrary result or whether we might decide the case differently is immaterial." *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005); **see** *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008).

**DISCUSSION**

**A.    The ALJ's Consideration of Medical Evidence**

Wheeler argues the ALJ's decision is defective because the ALJ:  (1) failed to accept as controlling the limitations placed by Dr. Johnson; (2) failed to give Dr. Johnson's opinions the greatest weight under the circumstances; and (3) failed to follow or properly discredit the opinions of Dr. Kimzey.  Wheeler argues the ALJ discounted Dr. Johnson's

opinion based on the brevity of the progress notes and failed to recognize that Dr. Johnson explained the basis for such brevity, but otherwise demonstrated a full and clear knowledge of Wheeler's condition.   Additionally, Wheeler contends the ALJ erred by giving Dr. Kimzey's opinions more weight than Dr. Johnson's, then failing to give all of Dr. Kimzey's opinions great weight.  Under these circumstances, Wheeler argues, the ALJ is substituting his own opinions for those of the physicians because the ALJ failed to consider the medical source statements.

Under the regulations, the ALJ must determine the weight to give a particular sources testimony based on a set of criteria.  The ALJ is to consider whether there was an examining or treating relationship; the length, frequency and nature of any treatment; whether the medical opinions are supported by objective and other evidence; the consistency of the medical opinion with the record as a whole; and medical specialization of the doctor giving the opinion.   20 C.F.R. §404.1527(d); SSR 96-2p.   "A treating physician's medical opinion is given controlling weight if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Choate v. Barnhart*, 457 F.3d 865, 869 (8th Cir. 2006) (alteration in original) (**quoting** 20 C.F.R. § 404.1527(d)(2)); **see** *Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008).   "[The court] will uphold an ALJ's decision to discount or even disregard the opinion of a treating physician where 'other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'"  *Choate*, 457 F.3d at 869 (**quoting** *Reed v. Barnhart*, 399 F.3d 917, 920-21 (8th Cir. 2005)).   Further, "a treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."  *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004).   Specifically, the ALJ may discount medical opinions regarding limitations which are at odds with the same medical source's progress notes and unsupported by medically acceptable data.  **See** *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (regarding treating therapist as "other medical source"); *Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004).   However, the regulations require "that the [ALJ] will always give good

reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), *i.e.*, an opinion(s) on the nature and severity of an individual's impairment(s)."  SSR 96-2p; **see** 20 C.F.R. §404.1527(d)(2).

The ALJ did not give significant weight to Dr. Johnson's opinions that Wheeler meets section 12.04 of the Listing of Impairments and had marked limitations in most areas of work-related function (TR. 22-23).   Although Dr. Johnson had directed Wheeler's medical care since 2003, Dr. Johnson's progress notes were brief and she did not provide detail for her assessments (TR. 22-23).   The progress notes provided evidence of Wheeler's stability and favorable responses to changes in medication.   Additionally, Wheeler saw her briefly for medication checks on a monthly or bi-monthly basis.  The ALJ noted Wheeler's treatment was inconsistent with Dr. Johnson's opinions of impairment and severity of symptoms.   Additionally, the progress notes described Dr. Johnson's observations of Wheeler differently than the separate impairment opinions sent to support Wheeler's claims for benefits.  Finally, the ALJ gave examples where Dr. Johnson's opinions were contrary to other medical evidence in the record including four different medical sources.  The ALJ noted and explained the weight given to each of Dr. Johnson's opinions and acknowledged the explanation for the progress note's brevity.  The ALJ's conclusions are supported in the record.

Wheeler makes an argument related to the weight assigned to Dr. Johnson's opinions by contending the ALJ failed to either follow or properly discredit the opinions of Dr. Kimzey, who conducted a consultative physiological evaluation.  Dr. Kimzey opined Wheeler had marked limitations in responding appropriately to work pressures in a usual work setting (TR. 23, 531).  Otherwise, Dr. Kimzey gave the opinion Wheeler suffered only moderate or slight limitations in other areas (TR. 530-531).  Dr. Kimzey's opinion regarding the marked limitation, if accepted, may have rendered Wheeler disabled, based on a hypothetical question posed to the VE (TR. 630-631).  However, the ALJ did not give great weight to Dr. Kimzey's opinion regarding a marked limitation because it was based on "interview data" suggesting Dr. Kimzey relied only on Wheeler's own reports to form the opinion (TR. 23).

"The opinion of a consulting physician who examines a claimant once . . . does not generally constitute substantial evidence." *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003) (citation omitted).  However, there are two exceptions to this general rule.  *Id.* The court "will uphold the ALJ's decision to credit a one-time consultant and discount a treating physician's opinion '(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'"  *Id.* at 812-13 (*quoting Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).

Here, the ALJ stated his reasons for discounting part of Dr. Kimzey's opinions.  Specifically, the opinion regarding a marked limitation was based on the same account of limitation the ALJ had already discredited, Wheeler's.  Further, the record evidence supports the ALJ's decision.  Additionally, Dr. Kimzey's other opinions were similar to the opinions made by other physicians and sources in the record.  Based on the law and the record in this case, there is substantial evidence in the record to support the ALJ's decision to credit part of Dr. Kimzey's opinions, while discounting another part, and discounting the opinions of the treating physician.

## B.    Credibility Determination

Wheeler argues the ALJ improperly applied the *Polaski* factors when evaluating the claimant's credibility regarding subjective allegations of her physical condition.  **See** *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  Specifically, Wheeler contends the ALJ noted the correct legal standards, but failed to provide enough information in the opinion to determine whether he employed the correct process.  **See** Filing No. 13 - Brief p. 22.  Wheeler states of the ALJ opinion:  "He simply stated that the 'alleged limitations appear out of proportion to the medical evidence of record . . . [and that] remaining SSR 96-7p factors cast doubt on her allegation of inability to perform any and all kinds of full-time, competitive, gainful employment on a sustained basis.'"  *Id.* (alteration in original) (**quoting** TR. 23–24).  Wheeler asserts the ALJ clearly did not evaluate the other criteria set forth in SSR 96-7p, 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3), and *Polaski*.

In determining a claimant's residual functional capacity (RFC), the ALJ must evaluate the claimant's credibility, in addition to considering the medical evidence and observations of physicians an others. *Willcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008). A court gives the ALJ deference in determining the credibility of a claimant's allegations concerning her limitations, where the credibility determination is supported in the decision. *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In evaluating subjective complaints, an ALJ is to examine objective medical evidence in addition to the factors set forth in *Polaski*. These factors include: (1) the claimant's day to day activities; (2) the duration, intensity, and frequency of symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322.

The ALJ applied the correct legal standard in evaluating Wheeler's credibility as to her symptoms and the effect, if any, those symptoms have on her ability to function (TR. 21). In determining a claimant's complaints are not credible, the ALJ must give the reasons for discrediting the testimony and explain any inconsistencies found. *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007). Here, the ALJ engaged in a thorough analysis of Wheeler's testimony and discredited her credibility pursuant to the applicable credibility criteria. Because the ALJ applied the correct legal standards, the court must take the ALJ's findings of fact as conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d at 833.

The ALJ found Wheeler's alleged limitations were inconsistent with the record as a whole (TR. 23). Specifically, the ALJ noted Wheeler used only over-the-counter medication for back pain and did not see a doctor for the pain. The ALJ also stated Wheeler's daily activities and restrictions were out of proportion with the medical evidence. Specifically, the medical evidence reported that Wheeler responded well to her medication after periods of increased stress and depression. The ALJ noted Wheeler's treatment history was relatively conservative (TR. 22). Wheeler primarily visited a psychiatrist for brief medication checks and a therapist, after a long period of absence, for grief counseling, according to the evidence in record (TR. 22, 24). The ALJ specifically

22

referenced each of the **Polaski** factors in application to the evidence presented by Wheeler at the hearing (TR. 23-24).

In this case, ALJ properly evaluated Wheeler's credibility based on evidence in the record including medical examinations and testimony. The record as a whole supports the ALJ's decision to discredit Wheeler's testimony as to the severity of her symptoms. Substantial evidence in the record supports the ALJ's determination of Wheeler's credibility.

## C.    Vocational Expert

Wheeler contends the ALJ relied on improper conclusions of the VE based on misstatements of either the exertion or skill level required to perform the occupations. Specifically, Wheeler argues the occupations identified by the VE, based on the hypothetical used, were to be "unskilled, sedentary" occupations. However, the job titles used by the VE, cashier and receptionist, and their definitions were actually contrary to the definitions used by the United States Department of Labor, Employment and Training Administration's Dictionary of Occupational Titles (4th Ed. Rev. 1991) (DOT). The DOT definition for cashier places it in a light exertion category, rather than sedentary. **See** 211.462-010. The DOT definition for receptionist positions it as semi-skilled, rather than unskilled. **See** 237.367-038. Accordingly, Wheeler argues the VE's testimony was not consistent with the DOT, nor was the inconsistency explained as is required by SSR 00-4p. Wheeler asserts the adjudicator may not rely on the VE's testimony under these circumstances pursuant to SSR 00-4p.

> [A]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the [DOT] unless there is evidence in the record to rebut those classifications. The Dictionary of Occupational Title definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range. [N]ot all of the jobs in every category have requirements identical to or as rigorous as those listed in the [DOT].

*Hillier v. Social Sec. Admin.*, 486 F.3d 359, 366-67 (8th Cir. 2007) (internal quotations and citations omitted).

With regard to the job of cashier, the VE testified at the hearing that, although the job is classified as "light" in the DOT, there are also a significant number of cashier positions performed at the sedentary exertional level (TR. 629).  The VE indicated there were 21,000 such sedentary level cashier jobs (TR. 629).  Additionally, the record evidence and Wheeler's job history indicated Wheeler had worked, at least part-time, as a cashier before, although perhaps not at the sedentary level.  In this case, the VE clearly indicated that, based on his experience, a significant number of cashier jobs were performed at the sedentary exertional level (TR. 629).

With regard to the job of receptionist, the VE testified that, although the job of receptionist is classified with a specific vocational preparation (SVP) level of 4 by the DOT, there are some positions performed at the SVP 1 or 2 level (TR. 630).  An SVP level denotes the skill level required for the position, for example SVP 1-2 corresponds to unskilled work requiring less than thirty days to learn.  **See** SSR 00-4p; **see also** 20 C.F.R. §§ 404.1568, 416.968.  Semi-skilled work corresponds to an SVP of 3-4.  *Id.*  The VE noted there were 27,525 positions available at the SVP 4 level (TR. 630).  He also indicated there were 4,404 receptionist positions, which could be performed at the unskilled level within the region (TR. 630).  Because the vocational expert explained the reduction in the number of available jobs based on skill level, he sufficiently explained his deviation from the description found in the DOT.  The VE is a specialist in employment and vocational factors which influence employment.  The ALJ was justified in relying on the VE's testimony in finding Wheeler not disabled.

## CONCLUSION

For the reasons stated above, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, should not be reversed or remanded.  The ALJ's decision does not contain the errors alleged by Wheeler.  Specifically, substantial evidence in the record supports the ALJ's decisions with regard to the weight assigned to Dr. Johnson's and Dr. Kimzey's opinions, Wheeler's credibility, and reliance on the VE's testimony.  Accordingly, the Commissioner's decision is affirmed.

**IT IS ORDERED:**

The decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 28th day of October, 2008.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge